**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**Dawn Eaton**

      **v.**                                                        Case No. 08-cv-186-PB
                                                                    Opinion No. 2009 DNH 102
**Michael Astrue, Commissioner
Social Security Administration**

**MEMORANDUM AND ORDER**

Dawn Eaton challenges the Commissioner of Social Security's ("the Commissioner") ruling that Eaton's daughter, Justine, is not entitled to Social Security Income ("SSI") payments. The case turns on whether the record contains substantial evidence to support the Administrative Law Judge's ("ALJ") determination that Justine's mental impairments were not so severe as to constitute an "extreme limitation" in her ability to care for herself. Although Eaton can point to evidence that favors her position, there is also substantial evidence to support the ALJ's decision. Accordingly, I deny Eaton's motion to reverse the ALJ's ruling and grant the Commissioner's motion to affirm.

## I.   BACKGROUND

Eaton filed an application for SSI payments on Justine's behalf in December 2006.[1]  Concerns about Justine's behavior, however, can be traced back to July 14, 2004, when Megan Davis, a social worker at Health and Education Services, completed a clinical evaluation of then three-year-old Justine.  Davis noted that Justine presented "symptoms of tantrums, defiance, hyperactivity, bitting and aggression toward animals, which begun [*sic*] three weeks prior, after moving from Florida to Haverhill, Massachusetts."  (Joint Statement of Facts, Doc. No. 11, at 2.)  It was Davis's belief that Justine's trauma "stemmed from witnessing domestic violence in her family."  (Id.)  Davis filled out a mental status evaluation form, wherein she noted that Justine's general appearance, thought content, speech, orientation, motor skills, memory, and mood were "unremarkable." Justine's insight and judgment were assessed as "age appropriate," her thought process as "logical," her intellect as "average," and her attitude as "negative."  (Tr. at 292.)  Davis

---

[1]  The parties jointly submit that Eaton filed an SSI application on December 12, 2006; however, the record reflects that said filing occurred on December 1, 2006.  This distinction is immaterial, but noted.

listed asthma on Axis II, described Axis IV as severe,[2] and

listed Justine's Global Assessment of Function ("GAF")[3] score as

_____

[2]   "Axis IV incorporates Psychosocial and Environmental
problems with the following checklist: a) problems with primary
support group; b) problems related to the social environment; c)
educational problems; d) occupational problems; e) housing
problems; f) economic problems; g) problems w/access to health
care; h) problems related to interaction w/ the legal system,
etc."  (Pl.'s Mot., Doc. No. 8-2, at 3 n.2.)

[3]   The Global Assessment of Functioning ("GAF") scale is
used "to track the clinical progress of individuals in global
terms, using a single measure.  The GAF scale is to be rated with
respect only to psychological, social, and occupational
functioning."  Am. Psychiatric Ass'n, Diagnostic & Statistical
Manual of Mental Disorders 32 (4th ed. 1994).  GAF scores are
assigned on a scale of 0-100, and that scale is "divided into 10
ranges of functioning."  Id.  A score within the range of 100-91
indicates "[s]uperior functioning in a wide range of
activities...," a score within the range of 90-81 indicates
"[a]bsent or minimal symptoms (e.g., mild anxiety before an
exam), good functioning in all areas...," a score within the
range of 80-71 suggests that if "symptoms are present, they are
transient and expectable reactions to psycho-social stressors
(e.g., difficulty concentrating after family argument); no more
than slight impairment in social, occupational, or school
functioning (e.g., temporarily falling behind in schoolwork," a
score within the range of 70-61 reveals "[s]ome mild symptoms
(e.g., depressed mood or mild insomnia) OR some difficulty in
social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships," a score within the range of 60-51 indicates
"[m]oderate symptoms ... OR moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers,") a score within the range of 50-41
reveals "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious
impairment in social, occupational, or school functioning (e.g.,

50.

On August 11, 2004, Justine was admitted to the Anna Jaques Hospital for treatment of her behavioral problems.  Judith Williams, a social worker, examined Justine, noted that she suffered from attention deficit hyperactivity disorder ("ADHD"), and assigned her a GAF score of 35.  At that time, Justine was not on any medication or undergoing any treatment for her mental impairments.  A medication regimen was initiated at some point during the hospital stay, and Justine was assigned to see Susan

---

no friends, unable to keep a job)," a score within the range of 40-31 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)," a score within the range of 30-21 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)," a score within the range of 20-11 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smear feces) OR gross impairment in communication (e.g., largely incoherent or mute)," and finally, a score within the range of 10-1 indicates "[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."  Id. at 34.

Blodget at Health and Education Services for an appointment on August 12, 2004.  She was discharged on August 16, 2004, at which point her GAF score was 45.  (Joint Statement of Facts, Doc. No. 11, at 3-4.)

By August 23, 2004, Blodget's progress notes indicate that Justine showed increasingly positive behavior.  She was sleeping and eating better and she "stopped acting out aggressively since start of meds [*sic*]."  Blodget's notes show that Justine was "talkative, curious . . . , acting appropriate for her age . . . , [and] pleasant."  (Tr. at 307.)  Justine's progress was erratic throughout September 2004; on September 7, Blodget reported an increase in Justine's bad behaviors, including tantrums; on September 15, an increase in medications appeared to be having a positive impact; and, on September 25, Blodget noted that Justine's "tantrums could not be controlled."  (Joint Statement of Facts, Doc. No. 11, at 4.)  On September 20, 2004, Pawtucket Medical Associates wrote a certificate of health, which held that Justine's special problems included "ADHD, bipolar [disorder], and asthma."  (Tr. at 193.)  The report showed that Justine was "healthy," and had "no apparent contraindications to participating in routine school and camp activities."  (Id.)

On October 8, 2004, Blodget reported that Justine was
compliant with her medications and her mood was "stable."  (Id.
at 315.)  Blodget had to continuously redirect Justine from her
attempts to open a door to a playroom, and Justine also felt
frustrated by outside noises coming from others in the building.
(Joint Statement of Facts, Doc. No. 11, at 5.)  Eaton reported
that although the medications were making Justine drowsy,
Justine's temper tantrums were also less frequent, she "displayed
good spirit," and, as of October 21, 2004, she appeared to be
functioning more normally.  (Id.)  Records indicate that by
January 18, 2005, Justine was doing well in preschool, and her
"mood instability and behavior concerns were much improved."
(Id.)

Justine's "out-of-control" behavior grew worse throughout
February 2005, and as a result, Justine was taken to the
emergency room in March.  (Id.)  Emergency room records indicate
that Justine was banging her head against the wall, grabbing
scissors while threatening to cut her own hair, and biting.
(Id.)  Justine was referred for additional clinical treatment to
work on behavior and boundaries, and by April 15, she "appeared
happy, compliant," and displayed unremarkable speech during her

-6-

treatment sessions.  (Tr. at 361.)  The same was true on May 5,
when it was also noted that she was doing well in school and not
having any problems with her schoolmates.  Clinical notes from
May 12 indicate that Justine's "mood instability with symptoms of
angry outbursts, tantrums, and crying was reported to have
improved," as well as her symptoms of aggression.  (Joint
Statement of Facts, Doc. No. 11, at 5-6.)

     On October 11, 2005, Justine began treatment under Kala
Kumar, M.D., at the Mental Health Center of Greater Manchester.
An initial objective mental assessment showed normal results,
with the exception of a mild increase in motor activity and
mildly poor insight.  Justine was diagnosed with ADHD,
oppositional defiant disorder ("ODD"), and asthma, and was given
a GAF score of 51.  She missed two appointments with Dr. Kumar,
but on November 14, Eaton reported that Justine was doing well at
school, though she had four outbursts over the previous week,
especially when Eaton responded "no" to certain of Justine's
behaviors.  (Id. at 6.)

     As of February 7, 2006, Justine was compliant with her
medications and was showing positive results; however, on March
8, Dr. Kumar gave her a GAF score of 45, thereby indicating that

-7-

Justine continued to exhibit "serious symptoms or impairment in overall functioning."  (Id.)  Eaton reported on April 4 that her daughter was doing well at school, and on June 6 that "her emotional outbursts were improving and were less frequent." (Id.)  Justine was promoted to the first grade, with her kindergarten report card showing improved or satisfactory performance in all areas of development.  (Tr. at 138.) Nonetheless, Gossler Park School -- a school outside of Justine's Parker-Varney school district -- denied her application for admission for the 2006-2007 school year, solely for the reason that she had "been absent 12 times and has been tardy 26 times this year with 6 dismissals."  (Id. at 136.)

On September 21, 2006, Eaton referred Justine to the Parker-Varney Special Education Team to assess whether Justine had any educational disabilities.  Ann Hutton, Psy.D., conducted two neuropsychological evaluations in early November.[4]  The Parker-

_____

[4] The results of these exams revealed that Justine "demonstrated age-appropriate skills, intellect, and behavior." (Joint Statement of Facts, Doc. No. 11, at 7.)  Hutton also explained that Justine's cognitive skills were intact and in the average range, with attention being her only weakness, and having low average verbal intellectual functioning.  Hutton believed Justine to be a visual learner, which she maintained might result in misconception or misjudgment.  She also noted "weakness including verbal cognitive skills, sustained attention and fine

Varney Special Education Team's report from December 12, 2006,
explained that "the results of Dr. Hutton's evaluations indicated
that [Justine] did not suffer from any educational disability and
that there were no indications that further testing was
warranted."  (Joint Statement of Facts, Doc. No. 11, at 8.)
Meanwhile, on November 29, 2006, Eaton had filed an application,
on Justine's behalf, for SSI childhood disability benefits.

Megan Waligura, Justine's first grade teacher, completed a
questionnaire on February 6, 2007, wherein she opined that
Justine displayed no problems in her ability to move around and
manipulate objects, none to slight problems in her ability to
engage others, none to slight problems in her ability to finish
tasks, and none to obvious problems in her ability to acquire and
use information.  Waligura further added:  "Although Justine is
working below grade level [in math and reading] she has made good
progress and certainly is not the only child in the class working
below expected levels at this point in first grade."  (Tr. at
166.)

_____

motor strength, adding that academic skills are also a weakness
for [Justine]."  (Id. at 7-8.)

On February 15, 2007, after reviewing Justine's records,
Michael Schneider, Psy.D., completed a Childhood Disability
Evaluation Form, wherein he opined that Justine's impairments
were severe, but not such that they met or were medically or
functionally equal to any listed impairment.  (Id. at 424.)  He
maintained that Justine "suffered from less than marked
limitations in the domains of acquiring and using information,
attending and completing tasks, and health and physical well-
being."  (Joint Statement of Facts, Doc. No. 11, at 9.)  With
respect to the domains of moving and manipulating objects, caring
for one's self, or interacting and relating with others,
Schneider found no limitations.  In July 2007, Eaton reported
that her daughter was doing well and that her "temper tantrums
were few and far between."  (Id. at 10.)  She further reported
that Justine "had not needed any emergency support, had completed
the first grade, and obtained good grades."  (Id.)  Also at that
time, Dr. Kumar gave Justine a GAF score of 65-70.

Stephanie Simpson, Justine's second grade teacher, completed
a questionnaire on November 27, 2007, wherein she explained that
Justine was reading at a second grade level, performing math and
written language at a 1.5 grade level, and not receiving any

-10-

special education services.  (Id.)  No limitations were reported

with respect to Justine's ability to interact with others, move

around and manipulate objects, or care for herself; however,

"none to obvious" problems were reported in Justine's ability to

obtain and use information, as well as attend and complete tasks.

(Id.)  Simpson further explained that when Justine complies with

her ADHD medication schedule, "she is able to focus [with]

minimal issues."  (Id. at 10-11.)  Two days later, on November

29, 2007, Nancy Thompson, a registered nurse practitioner who had

been treating Justine since August 20, 2007, made an assessment

of Justine's residual functional capacity.  She noted that

Justine suffered from ADHD, ODD, and asthma, and she assigned

Justine a GAF score of 45, "indicating serious symptoms or

impairment in functioning."  (Id. at 11.)  She further opined:

> [Justine] suffered from none to slight impairments in
> the domains of acquiring and using information,
> interacting and relating to others, moving about and
> manipulating objects, and health and physical well
> being; moderate impairments in the domain of attending
> and completing tasks; and extreme limitation in the
> domain of caring for yourself.

(Id.)  Thompson qualified her assessment of "extreme limitation"

in self care, explaining that Justine had poor hygiene, talked

frequently to strangers, and inflicted injury on herself.  (Id.

-11-

at 12.)

On November 29, 2007, Eaton and Justine appeared before Administrative Law Judge James L. D'Alessandro (the "ALJ") regarding her application for SSI benefits.  Eaton first testified that Justine recently had been having trouble sleeping, and so her dosage for Clonidine had been increased from three per day to three and a half per day.  (Tr. at 23.)  She explained that during an October 2007 parent-teacher conference she learned from Justine's second grade teacher that Justine was having trouble in math and reading.  The teacher determined that extra help would be appropriate, and she planned to reassess Justine's progress after a few weeks.  (Id. at 24.)  Eaton reported that, up until the date of the hearing, Justine had only been absent from school roughly four times, due to illness and medical appointments.  She also explained that Justine's asthma had been under control with medication, and that although Justine was very hyper when she got home from school, behavior and chore charts had been effective tools in controlling that energy.  (Joint Statement of Facts, Doc. No. 11, at 12.)  Eaton testified that most of Justine's behavioral problems occurred outside of school, but that Justine's desire to always want to be near Eaton was

improving with medication.  Only once during the school year had
Justine received detention due to hyperactivity in the classroom.
(Id.)

Justine testified that she had friends in the neighborhood
with whom she played common childhood games such as hide-and-seek
and tag, and that she did chores around the house, put away her
own laundry, and "t[ook] showers two days in a row."  (Tr. at 33-
34.)  Eaton explained that she previously had trouble getting
Justine into a routine for taking showers and brushing her teeth,
but that using chore charts was having positive results and
Justine was doing "pretty well."  (Tr. at 34.)  Eaton testified:
"I still struggle with her, and I do have to watch her, but its
not as bad as it used to be."  (Id. at 36.)

On December 12, 2007, the ALJ issued his written decision
denying Eaton's application for SSI benefits, finding that
Justine was not disabled under section 1614(a)(3)(C) of the
Social Security Act.  (Id. at 16.)  In accordance with 20 C.F.R.
§ 416.924(a), the ALJ followed the three-step sequential
evaluation process used to determine whether a person under
eighteen years of age is disabled.  At step one, the ALJ
determined that Justine had "not engaged in substantial gainful

activity at any time relevant to this decision." (Id. at 11.)
At step two, the ALJ found that Justine suffered from two
medically determinable "severe" impairments, ODD and ADHD.

Having found that Justine had a severe impairment, the ALJ
proceeded to step three; however, at this step, he found that she
did not have "an impairment or combination of impairments that
meets or medically equals one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1." (Id. at 12.)  The ALJ
also found that Justine did not have an impairment or combination
of impairments "that functionally equals the listings." (Id. at
13.)  In reaching this conclusion, he noted Eaton's comments
about the problems Justine had been having at home, but also her
belief that Justine had been responding to a behavior chart.  He
also referenced Justine's own testimony that she helped her
mother with household cleaning, put away her own laundry, and
took showers.  The ALJ considered reports from Justine's
teachers, one of which maintained that Justine had "no problems
caring for herself." (Id. at 15.)  Finally, the ALJ noted Nurse
Thompson's view about Justine's ability to care for herself, but
determined that the weight of the evidence did not support the
conclusion that Justine was "extremely" impaired with regard to

-14-

caring for herself.  (Id.)

The Federal Decision Review Board upheld the ALJ's decision on March 12, 2008, thus making that ruling the final decision of the Commissioner.

## II.  **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court, following a timely request, may review the administrative record and "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."  However, the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). It is also solely within the purview of the Commissioner to make determinations as to "credibility and to draw inferences from the record evidence."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  Accordingly, in reviewing the record for substantial evidence, a district court may not reweigh the evidence or substitute its own judgment for

that of the Commissioner's.[5]  Id.

The reviewing court is not bound to the Commissioner's findings in all instances.  Where the Commissioner has committed some legal or factual error in his evaluation of the disability claim, deference is not be appropriate.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Further, the ALJ's findings of fact will not be conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citation omitted).


### III.  ANALYSIS

A determination as to whether a child-claimant is disabled is made pursuant to a three-step process.  After examining whether the child-claimant has engaged in substantial gainful activity and suffers from a severe impairment, an ALJ must determine whether the impairment "meet[s], medically equal[s], or functionally equal[s] the listings.  In the event that an ALJ

---

[5]  Substantial evidence is "more than a mere scintilla" of evidence; it "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 597 (1st Cir. 1980)(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

concludes that a claimant's impairments do not correspond to any
of the listed impairments, he is next required to evaluate
whether the claimant's impairments cause limitations that are the
functional equivalent of the listed impairments.  20 C.F.R. §
416.926a.  Functional equivalence requires an ALJ to assess six
domains of functioning: acquiring and using information,
attending and completing tasks, interacting and relating to
others, moving about and manipulating objects, caring for
yourself, and health and physical well-being.  § 416.926a(g)-(l).
In order for a claimant's impairment to "functionally equal the
listings," it must "result in 'marked' limitations in two domains
of functioning or an 'extreme' limitation in one domain."  §
416.926a(a).[6]

     Eaton asserts that Justine's impairments "interfere very
seriously" with the domain entitled "caring for yourself," and
that, as a result, she suffers an extreme limitation in one of
the major domains.  (Pl.s' Mot., Doc. No. 8-2, at 12.)  As
support for this position, she points most forcefully to the
opinion espoused by Nurse Thompson, who wrote on November 29,

---

     [6]  20 C.F.R. § 416.926a(e) sets out in depth definitions of
"marked" and "extreme."

-17-

2007, "Justine refuses to brush her teeth daily and a hygiene chart was implemented on 11/07 to work on hygiene, including bathing.  Safety concerns include speaking freely to strangers. Justine also head bangs and punches self on the body."  (Tr. at 572.)  Although Eaton first asserts that the ALJ "ignored" Thompson's assessment -- an accusation that is without merit -- she later refines her argument to say that "the ALJ did not afford proper weight to Nurse Thompson's opinion."[7]  (Pl.'s Mot., Doc. No. 8-2, at 12-13.)

Eaton offers what she believes to be evidence corroborating Nurse Thompson's view.  First, she cites Dr. Kumar's reports, which document Justine's "horrific experiences," illnesses, and "severe behavioral issues."  (Id. at 14.)  She also points to Dr. Kumar's consistent assessments between December 7, 2005 through February 6, 2007, of Justine's GAF scores between 45 to 48, which

---

[7] When making disability decisions, ALJs are required to give a treating physician's opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(d)(2). "Medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . . are important and should be evaluated on key issues such as impairment severity and functional effects."  SSR 06-03p.  In short, regardless of its source, a court "will evaluate every medical opinion" it receives.  § 404.1527(d).

is "indicative of severe limitations in functioning." (Id.)  She
next turns to school records, highlighting the first grade
teacher's view that Justine was working below grade level in math
and reading.  In a portion of her brief entitled, "Fine Motor
Skills," Eaton cites teacher evaluations from September 2006,
which note that Justine completed her homework less often than
her peers, was easily distracted, had difficulty skipping,
forming letters, and spacing out her math problems, used both
feet when climbing stairs, and often broke her pencil tip.  (Id.
at 16.)  Finally, Eaton cites empirical evidence of the types of
problems that children who witness domestic violence often have,
such as aggressive behavior and reduced social competencies.
(Id. at 17.)  All this, she maintains, supports Nurse Thompson's
view that Justine is extremely limited in her ability to care for
her physical health and safety.

      Examining the record as a whole, it is clear that Nurse
Thompson's view is not supported by substantial evidence.  On the
contrary, there is ample evidence to support the Commissioner's
finding in this case.  With respect to Nurse Thompson's view,
there is no other source cited in the record willing to claim
that Justine is severely limited in the domain of caring for

-19-

herself.  Without question, Dr. Kumar's records of her dealings
with Justine reveal some troubling realities.  She diagnosed
Justine with ADHD, ODD, and asthma, and gave her a GAF score of
51 in October 2005.  Dr. Kumar noted progress in early 2006, but
assessed her GAF score at 45 at that time, which indicated
"serious symptoms or impairment in overall functioning."  (Joint
Statement, Doc. No. 11, at 6.)  By April, however, Eaton herself
reported that Justine's emotional outbursts were improving and
were less frequent.  Short of diagnosing certain medical
impairments and assessing a GAF score, Dr. Kumar never made the
claim that Justine was severely limited in her ability to care
for her own physical health and safety.  Merely diagnosing an
impairment does not mean that the impairment is so severe that it
"functionally equals the listings."  20 C.F.R. § 416.924(a); see
Foster v. Brown, 853 F.2d 483, 488-89 (6th Cir. 1988)
(diagnosable impairment is not necessarily disabling); Alvarado
v. Weinberger, 511 F.2d 1046 (1st Cir. 1975) ("[t]he mere
existence of a psychoneurosis or an anxiety reaction does not
constitute a disability").  Moreover, in July 2007, Dr. Kumar
gave Justine a GAF score in the range of 65-70, which reflects
her belief that Justin had "some mild symptoms or some difficulty

-20-

in social, occupational, or school functioning, but [was]
generally functioning pretty well, [and had] some meaningful
interpersonal relationships." (Joint Statement of Facts, Doc.
No. 11, at 10 n.9.) This assessment of Justine's limitations is
quite different from the one put forth by Nurse Thompson in
November 2007.

Eaton points to a series of GAF scores as evidence
supporting Nurse Thompson's position, but the utility of GAF
scores for this purpose is limited. As the evidence in this case
demonstrates, GAF scores tend to fluctuate. In this case alone,
the parties' joint filing notes several different GAF scores,
ranging from a 35 on August 12, 2004, to a 65-70 range in July
2007. Moreover, fluctuations also occur within short spans of
time. For example, on August 12, 2004, Justine's GAF score was
35, but just a few days later on August 16, her score had risen
to 45. GAF scores offer a snapshot of one's state at the time of
the evaluation, but for an impairment to functionally equal a
listing it must also meet the duration requirement, about which
the GAF score says nothing. See 20 C.F.R. § 416.909 ("Unless
your impairment is expected to result in death, it must have
lasted or must be expected to last for a continuous period of at

least 12 months."). Though they can be helpful in evaluating the extent of one's mental impairments, GAF scores are not dispositive when deciding whether a disability exists. <u>See</u> <u>Chanbunmy v. Astrue</u>, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008).

The rest of the evidence that Eaton cites as support for Nurse Thompson's opinion is attenuated in its relationship to the domain of "caring for yourself." The reports from Justine's teachers do little to suggest that she is severely limited in her ability to care for herself. In fact, Justine's second grade teacher reported that Justine "did not suffer from any limitations in her abilities . . . to care for herself." (Joint Statement of Facts, Doc. No. 11, at 10.) Whether a student uses two feet to climb stairs and presses too firmly on her pencil may be indicative of other problems, but it does not support the inference that Justine is severely limited in her ability to care for herself. Eaton also cites empirical evidence related to the impact that domestic abuse can have on a child's development. These reports are troubling, as well as painful reminders of the lasting impact that such abuse can have on innocent children; however, they are general studies that have not been adequately connected to Nurse Thompson's view of this particular case.

-22-

There is substantial evidence cutting against Nurse
Thompson's opinion.  Most striking is the fact that no other
educator or medical professional involved in Justine's case has
articulated the same, extreme opinion.  To refute this, Eaton
cites an August 11, 2004, assessment by social worker Judith
Williams, wherein she assigned Justine a GAF score of 35.  This
raw number, however, does not necessarily amount to a statement
that Justine is severely limited in the domain of "caring for
yourself."  In fact, Williams's report suggests that there has
been significant progress -- or, at least, changes in treatment -
- since she first saw Justine in August 2004.  At that time,
Justine was neither undergoing treatment nor receiving medication
for her problems.  (Joint Statement of Facts, Doc. No. 11, at 3-
4.)  By November 27, 2007, her second grade teacher reported that
because of her medications, Justine was able to focus with
minimal issues.  (Id. at 11.)  On March 5, 2005, Justine was
taken to the emergency room for her out-of-control behavior,
including banging her head against the wall, but by April 28,
2005, clinical reports showed that Justine was happy and
compliant during clinical treatment and doing well in school.  In
May 2005, Justine's outbursts, tantrums, and crying had all

-23-

improved.  (Id. at 5.)  While there were undoubtedly setbacks in
Justine's progress, the record reveals a child coping with
serious issues, but who is also making progress.

State agency physician Michael Schneider reviewed Justine's
records, and on February 15, 2007, reported that her limitations
were severe, but not to the extent that they equaled any listed
impairment.  (Id. at 9.)  He also found less than marked
limitations in the domain of health and well-being.  This is
consistent with a report from Justine's first grade teacher dated
February 6, 2007, which stated that Justine had no problems in
the domain of "caring for herself" and that her behavior was age-
appropriate.  (Tr. at 170.)  Eaton offered her own assessment of
Justine in July 2007, when she explained that there was no need
for any emergency support and that Justine's "temper tantrums
were few and far between."  (Id. at 559.)  Reports from her
second grade teacher were also consistent in noticing this trend
in Justine's behavior.  As the ALJ noted in his written order and
Eaton testified to at Justine's hearing, the use of charts at
home was having a positive impact in getting Justine to do her
chores and clean herself.  (Tr. at 12, 36.)  Eaton stated at the
hearing, "I still struggle with her, and I do have to watch her,

but it's not as bad as it used to be. . . .  The behaviors,
honestly, with the medication and stuff that she's on, and the
help that we're getting through the charts and everything, I see
a little bit of an improvement."  (Id. at 36.)  Nurse Thompson's
opinion is the outlier in a record replete with evidence
unsupportive of her view; therefore, the ALJ was not acting
improperly when he disregarded her opinion that Justine was
severely limited in her ability to care for herself.

The ALJ's ultimate conclusion that Justine is not disabled
is supported by substantial evidence in the record.  The written
opinion from December 12, 2007, notes Justine's history as a
witness to domestic violence, the hospitalization that resulted
from her behavioral problems at home, her generally good behavior
at school, the medications prescribed for her use, and the
various reports and records that have amassed from years of
undergoing tests and counseling.  (Id. at 12.)  The decision
examines whether Justine's ADHD resulted in an impairment that
meets or medically equals one of the listings.  The ALJ assessed
her cognitive functioning, noting Nurse Thompson's view that
Justine had only slight limitations in her ability to acquire and
use information, as well as Justine's progress in school.  The

ALJ determined, based on this evidence, that Justine had less than marked impairments in cognitive functioning.  Next, the ALJ noted the generally positive reports from teachers and Anna Hutton, Psy.D., as to Justine's social skills.  Despite some problems Justine had at home with her temper, the ALJ found less than marked impairments in Justine's social skills.  With regard to Justine's personal functioning, the ALJ considered evidence of Justine's tendency to "express[] emotions inappropriately through tantruming at home and in counseling sessions."  (Id.)  He noted reports from Justine's second grade teacher, which revealed that Justine had no problems handling frustration, caring for her physical needs, or maintaining personal hygiene.  The ALJ added that while Nurse Thompson had concerns about Justine's refusal to brush her teeth, testimony from Eaton evidenced that progress was being made by using charts.  He noted that Justine was also working on issues of safety, such as talking to strangers.  Considering this evidence, the ALJ refused to endorse Nurse Thompson's view that Justine's "functioning is significantly below age level," and therefore, found that her functioning in this domain to be less than markedly impaired.  (Id.)

     After having found that Justine did not have an "impairment

-26-

or combination of impairments that either meets or equals the
severity of an impairment described in Appendix 1, subpart P,
Regulations No. 4," the ALJ turned to assess whether Justine's
impairments "functionally" equal the listings.  (Id. at 13.)
Here, a variety of evidence was considered, including Justine's
problems at home, the introduction of behavior charts, and
Justine's own testimony about her interactions with her friends
and family.  The ALJ determined that although the evidence showed
that Justine's impairments could have caused many of the symptoms
addressed in the record, it did not support the more aggressive
statements concerning the intensity, persistence, and limiting
effects of those symptoms.  (Id.)  He contrasted Eaton's
testimony about Justine's problems at home with the generally
positive reflections offered by Justine's teachers, one of whom
opined that Justine had no problems either dealing with others or
caring for herself, and had only minimal issues with taking her
medications.  He weighed Nurse Thompson's opinion against
opinions from others associated with Justine, and ultimately
determined that Nurse Thompson's opinion was not the best
assessment of Justine's limitations.  As a result, the ALJ
determined that Justine did not have an impairment functionally

equivalent to a listing, and that therefore, she was not
disabled.

A few additional points about the ALJ's opinion are worth
noting.  First, while the ALJ ultimately determined that Nurse
Thompson's opinion was not controlling, he nonetheless referenced
her views at various points in the decision, often concurring
with her assessments.  For example, in his evaluations of
Justine's cognitive functioning, the ALJ cited Nurse Thompson's
November 2007 report that Justine had no more than slight
limitations in acquiring and using information. Second, in
explaining why he did not think Nurse Thompson's opinion with
respect to the domain of "caring for yourself" was supported by
the record, the ALJ cited the report of state psychologist
Schneider; however, he did not rely solely on Schneider's report
in making his determination.  Rather, it was simply another piece
of evidence tending to cast doubt on Thompson's opinion.
Finally, the ALJ did not list any specific GAF scores as part of
his analysis, but he did consider Justine's mental impairments in
a way consistent with her GAF scores.  He acknowledged the long
road she has faced, but also the progress that has been made
thanks to the diligent efforts of educators, medical

professionals, and family.  GAF scores are a useful tool in
assessing one's capacity, but, like the opinions of those
involved in the case, they must be considered in light of the
evidence as a whole.  Here, the whole of the evidence
substantially supports the Commissioner's disability
determination.

## IV.  CONCLUSION

Although the Commissioner could have reached a different
result, there is substantial evidence in the record to support
his decision.  Having made that determination, this Court is
without authority to overturn it.  The plaintiff's motion for
order reversing the decision of the Commissioner (Doc. No. 8) is
denied.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 7, 2009

cc:  Raymond Kelly, Esq.
     Gretchen Leah Witt, Esq.